**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Criminal No. 19-645 (SRC)** |
| v. | : | |
| | : | |
| JAMAL JOHNSON | : | **OPINION** |
| | : | |

**CHESLER**, District Judge

This matter comes before the Court upon various pretrial motions filed by Defendant

Jamal Johnson ("Defendant" or "Johnson") on November 8, 2019. Johnson is charged in a one-

count Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §

922(g)(1). Principally, Defendant moves to suppress evidence of the firearm and ammunition

discovered on March 21, 2019 in two allegedly unconstitutional searches of the home of his

girlfriend, Arianna Rodriguez,[1] and to suppress evidence of certain statements he and Ms.

Rodriguez made subsequent to the searches on the same date. He also moves to compel

production of various discovery, including Brady and Jencks Act material, expert reports, and

Rule 404(b) evidence to be used at trial. The United States of America (the "Government") has

opposed Johnson's motion in its entirety.

On January 30, 2020 and February 5, 2020, the Court held an evidentiary hearing on the

motion to suppress evidence. At the evidentiary hearing, the Government called as witnesses

---

[1] According to the testimony of both Ms. Rodriguez and Johnson, the two had been in a close
romantic relationship for approximately five years at the time of the events relating to this case.
They confirmed at the evidentiary hearing that they remain a couple to the present day.

Officer Anthony Pompeo and Sergeant Christopher Durning, both of the New Jersey State

Police. The Defense called as witnesses Arianna Rodriguez, Brenda Johnson Benjamin,

Defendant Jamal Johnson, and Defense Investigator Colleen Flanagan. The Court also took

various other evidence, including, among other items, Ms. Rodriguez's sketch of the layout of

her apartment and the officers' movements therein on the day in question; a blanket identified by

Defendant and Defendant's investigator as the item used to conceal the firearm at issue; a

photograph of the closet where the firearm was found; and photographs of the firearm and

ammunition found in the searches of March 21, 2019.

Following the hearing, the Court provided an opportunity for supplemental briefs to be

submitted. The Court has considered all papers filed in connection with the pretrial motions, as

well as the evidence presented at the evidentiary hearing. For the reasons set forth below, the

Court will deny Defendant's motion to suppress in its entirety. It also issues rulings concerning

the balance of the omnibus motion filed by Defendant.

## I.   FACTUAL BACKGROUND

A warrant for Johnson's arrest was issued on March 19, 2019 by the municipal court in

Middlesex Boro, New Jersey for his alleged involvement in a home invasion burglary and

vehicle theft that occurred in that town on January 12, 2016. In the early morning of March 21,

2019, officers from the New York/New Jersey Regional Fugitive Task Force of the United States

Marshal's Service went to two locations in Newark, New Jersey looking for Defendant. The

arrest warrant identified Johnson's address as "North 12th Street" in Newark, but a database

consulted by law enforcement before the date of the search revealed two Newark addresses

linked to Defendant: 25 Johnson Avenue and 60 North 12th Street. Although no surveillance of

25 Johnson Avenue was conducted prior to March 21, 2019, the officers decided to go to that

address first.

### A.   The Initial Search of the Rodriguez Home

Early in the morning, a group of approximately seven police officers, including Officer

Anthony Pompeo, arrived at 25 Johnson Avenue, a multi-unit apartment building.[2] Defendant's

sister lives in one of the apartments at 25 Johnson Avenue and Defendant's girlfriend, Arianna

Rodriguez, lives with her four minor children in another. The officers began by knocking on the

door to the apartment belonging to Defendant's sister. They asked the sister if Johnson was in

her apartment, and when she answered that he was not, they apparently swept the apartment to

confirm this information. The officers also asked the sister if Ms. Rodriguez lives in the

apartment down the hall, and she responded that it was in fact the home of Arianna Rodriguez.

The officers proceeded to Ms. Rodriguez's apartment to execute on the arrest warrant against

---

[2] At the evidentiary hearing, Officer Pompeo and Ms. Rodriguez respectively testified as to the events surrounding the searches at issue in this motion. They gave different estimates of the officers' time of arrival at the search location: Officer Pompeo stated the task force arrived around six in the morning, but Ms. Rodriguez asserted it was about five a.m. In general, these two witnesses gave accounts of the searches that are broadly similar but contradict each other in several key respects, chiefly whether Ms. Rodriguez gave the officers permission to look for Johnson. The Court will delve into those differences as needed in its analysis.

Johnson. This Opinion will hereinafter refer to the 25 Johnson Avenue apartment where Ms.

Rodriguez lives as the "Rodriguez home." The two searches challenged in this motion as

unconstitutional occurred in the Rodriguez home. [3]

The encounter between law enforcement and Ms. Rodriguez began when the officers

knocked on the door to the Rodriguez home. According to Officer Pompeo, at about six in the

morning, the group of armed officers, dressed in tactical gear, arranged themselves in a stack

formation outside the apartment door, meaning the officer wielding a shield would be the first at

the door. According to Officer Pompeo, Ms. Rodriguez opened the door and appeared as if she

had been woken from sleep. He testified that the officers identified themselves as police and told

Ms. Rodriguez they were looking for Jamal Johnson because they had a warrant for his arrest.

Ms. Rodriguez was asked by the police if Johnson was in the apartment, and she answered that

he was not. Officer Pompeo asserted that the officers heard noise inside the apartment, that they

asked Ms. Rodriguez if they could take a look to confirm that Johnson was not in the Rodriguez

home, and that she gave verbal consent for the officers to search. Officer Pompeo testified as

follows:

> Q.   What did you hear?
>
> A.   We could hear a commotion in the back part of the apartment.
>
> Q.   Was Ms. Rodriguez questioned about that?

---

[3] Defendant and Rodriguez testified that Defendant once lived in the Rodriguez home but had moved into his mother's home about three years before the date of the search because his mother had become ill. Nevertheless, their testimony also established that, on the date in question, Defendant had a key to the Rodriguez home, kept some personal belongings there, and stayed overnight at the Rodriguez home a few times a week.

A.     We asked her who was with her. She did indicate that her children

were with her.

Q.     Did she say anything about Mr. Johnson's whereabouts?

A.     At that point she said he wasn't there.

Q.     And did she say anything further regarding your presence there at

the apartment?

A.     At the door or  --

Q.     Yes, at the door.

A.     No. We just asked her if we could take a look around to make sure

he is not here. You know, we talked to her further at that point.

Q.     Okay. When you asked her that, what did she say?

A.     She said no problem.

Q.     What was her demeanor with you at that point?

A.     Very calm.

Q.     And when she said "no problem," did she block the doorway, did

she move?

A.     No. She stepped to the side. We came in, and somebody stayed

with her.

(Tr. 22:18-23:15.)

According to Officer Pompeo, before searching the apartment, the officers called the

children to come out from the back area of the Rodriguez home, in case the officers encountered

a threat as they searched. The officers proceeded to sweep the apartment, looking in places

where Johnson could be hiding, and opened the door to a closet in Ms. Rodriguez's bedroom. There, they found a semi-automatic Norinco rifle model SKS (hereinafter, the "Firearm.") Officer Pompeo was not the person who found the Firearm; rather, the investigation report shows that it was discovered by "Officer Savnick." Officer Pompeo testified, however, that after the Firearm was found, the officers who had gone to that area of the Rodriguez home to search asked him to come into the bedroom. Officer Pompeo further testified that when he entered the bedroom, he observed the Firearm in the closet. According to Officer Pompeo's testimony, the officers who found it advised Officer Pompeo that they found it "just by opening the closet and checking in the closet."[4] (Tr. 25:14-15.) Officer Pompeo then went back out to the living room, where, according to him, Ms. Rodriguez had remained during the time of the search. He proceeded to talk to her about where the task force might find Jamal Johnson to execute the arrest warrant.

Ms. Rodriguez denies that she was asked for consent to look through her home for Johnson. According to her testimony, she was woken from sleep by the sound of someone banging on her door at about five in the morning. Ms. Rodriguez asserts that after the officers identified themselves as police, she opened the door, and immediately, three of the officers entered the apartment. She said they were asking for "the man" then specified that they were looking for Jamal Johnson. (Tr. 129:10-16.) Ms. Rodriguez told the police that Johnson was at his mother's house and that only she and her children were home. Nevertheless, according to Ms.

---

[4] Pursuant to Federal Rule of Evidence 1101(d)(1), the Court may admit hearsay testimony given at the pre-trial evidentiary hearing to determine questions of fact raised by the instant motion to suppress. See United States v. Raddatz, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.").

Rodriguez, one of the officers walked further into the apartment, pointed down the hall (located at the back of the apartment and perpendicular to the living area), and asked who was back there. She told him that her children were in her bedroom. (Ms. Rodriguez described the apartment as having three bedrooms, all located down this hall.) Ms. Rodriguez testified that, without her permission, the officer proceeded to go into her bedroom and look in her closet, where he found the Firearm hidden behind clothing. As she sketched a drawing of the apartment layout and indicated the position of the officers inside the apartment, Ms. Rodriguez testified as follows:

> Q.    And when you opened the door, can you tell me, were the officers in the hallway or did they enter?
>
> A.    Three of them like they right here inside of my apartment.
>
> Q.    So those three circles that you are making, those represent the officers who entered your home when you opened the door?
>
> A.     Yes.
>
> Q.     All right.
>
> Now, you mentioned something about an officer came in and stood by the table?
>
> A.    Yeah. He asked me who was there with me.
>
> I said: Just me and my kids.
>
> And he walked over here when he was asking me that question, and point where my kids was in the rooms.
>
> And I said yes.
>
> So he go to my room and –

* * *

He walk over, and when he go to my room, he checked my closet,

and that is when they found . . .

When he go to my room to my bedroom, he check my closet, and

then he found the gun behind my clothes.

* * *

Q.     So at the point that he goes into the bedroom, how many officers

are inside the house?

A.     Three, where he's in the hallway.

Q.     I'm sorry.

You are saying three were inside the house, and three were outside

of the house?

A.     Yes.

Q.     And did the officers ask for consent to enter your house?

A.     No.

Q.     Did the officers ask for consent to search the house?

A.      No.

(Tr. 133:18-134:9; 135:5-11; 136:3-14.)

Then, according to Ms. Rodriguez, the officer who had gone into the bedroom first

called her and other officers to come over to where he was. Ms. Rodriguez testified that when

she walked into the bedroom, the Firearm was lying on the bed, on top of a blanket. She further

testified that, in the bedroom, the police officers confronted her about the Firearm. Ms.

8

Rodriguez swore that the officers threatened that she could go to jail for murder because the Firearm was found in her home and therefore must belong to her. She says she began to cry because she was frightened.

Thereafter, Ms. Rodriguez was brought to the living room of her home. She had to remain there pending further investigation concerning the Firearm. Ms. Rodriguez was permitted to call her father to come over and help see the children off to school.

### B.      Arrest of Johnson at North 12th Street

The officers did not locate Johnson in their early morning search of the Rodriguez home. They had asked Ms. Rodriguez if she knew where Johnson might be, and she told the officers to check Johnson's mother's house and provided them with the address. At that point, a decision was made to for some of the officers to go to the mother's house at 60 North 12th Street and for others to stay behind with Ms. Rodriguez for an investigation prompted by the Firearm. Officer Pompeo was one of those who went to 60 North 12th Street, the home of Brenda Johnson Benjamin. Officer Pompeo estimates that the trip from the Rodriguez home at 25 Johnson Avenue to 60 North 12th Street took approximately 15 to 20 minutes.

Johnson was, in fact, located at his mother's home. He was arrested there without incident at approximately 7 a.m. and placed inside Officer's Pompeo unmarked law enforcement vehicle.[5] The officers also arrested Johnson's brother, Jabril, on an unrelated matter, requiring

---

[5] Testimony regarding the arrest was received from three witnesses: Officer Pompeo, Defendant, and Defendant's mother, Brenda Johnson Benjamin, who was home at the time of the arrest. Because their testimony on this subject is not pertinent to the factual and legal issues before the Court on this motion to suppress, the Court does not recount it in detail.

some officers who had responded to 60 North 12th Street to take Jabril Johnson to the police station for processing.

According to the Government, immediately after the arrest, it was not clear whether Newark Police, New Jersey State Police or the Middlesex County detectives would be taking custody of Johnson. Because of this, and to avoid further depletion of the task force team, the officers who had gone to 60 North 12th Street decided to reunite with the rest of the team at 25 Johnson Avenue to participate in the investigation into the Firearm. Officer Pompeo returned to 25 Johnson Avenue, with Johnson in the backseat of the vehicle. Officer Pompeo parked his vehicle in front of the building and went inside. In the meantime, Johnson remained in the vehicle under the supervision of another officer.

Johnson maintains that while he sat in the vehicle, one of the officers (not Officer Pompeo) left the car, went into the building at 25 Johnson Avenue, and came back out to speak to Johnson about the Firearm. According to Defendant's testimony, the officer opened the vehicle's backseat door, made a gesture indicating the Firearm, and pressured Johnson to admit that the Firearm was his. Defendant stated under oath that this officer threatened that if Johnson did not take responsibility, Ms. Rodriguez might face criminal charges related to the Firearm, go to jail, and lose custody of her children. Johnson testified as follows:

> Q.    And what happened at Johnson Avenue?
>
> A.    When we got there, hum, one of the cops went upstairs. He stayed for some -- for a few. Then he came back downstairs. They confronted me about the gun, and said: What are we going to do about this?

10

And he had his hand out like this, and the gun was there.

That is when I said -- I shook my head, like what are you talking about.

He said: Come on, Man. We might have to lock her up and call DYFS.

When he said that, I sighed, like shook my head again. I looked at him,

kind of looked away.

He said: Come on. Don't make us do that. There is kids upstairs.

Once he said that, that is when I said the gun was mine.

Once that was established, then he said: Well, we still going to take her to

the precinct in case when you get back, you decide to say it is not

yours because guys do that.

But he said: Sometimes we have guys that do that.

And he went back upstairs.

(Tr. 244:13-245:10.)

Officer Pompeo testified that has no knowledge of such a conversation between anyone from law enforcement and Johnson having occurred while Johnson sat in Officer Pompeo's vehicle outside 25 Johnson Avenue.

Additionally, Officer Pompeo stated that he does know either Johnson or Ms. Rodriguez. He further testified that prior to March 21, 2019 had never arrested Johnson or made contact with either Johnson or Ms. Rodriguez.

## C. The Second Search of the Rodriguez Home

In the meantime, while part of the law enforcement team went to 60 North 12th Street, some officers remained at the Rodriguez home, as they now had to pursue an investigation

11

concerning the Firearm. The timing of when that continued investigation took place differs according to the testimony given by Ms. Rodriguez and two law enforcement witnesses involved in the Firearm investigation, Officer Pompeo and Sergeant Christopher Durning of the New Jersey State Police's Major Crimes Unit. Sergeant Durning was not part of the original team that went to 25 Johnson Avenue to execute the arrest warrant against Johnson; he was called later to respond to the Rodriguez home to assist with the Firearm investigation.

According to Ms. Rodriguez, immediately after the officers confronted her with the Firearm in her bedroom, she returned to the living room, where she was asked to sign a form giving the officers permission to search her entire apartment. Ms. Rodriguez testified that two officers presented her with the form and told her if she did not sign the form giving consent, they would go to a judge and get permission to search her home. Ms. Rodriguez signed the consent form, which was in the style of a carbon copy with a top original layer and a yellow copy underneath. She asserts that this exchange concerning the consent-to-search form took place at approximately 5:25 a.m., explaining that she knows this because when she signed the form, the officer who presented it to her said out loud that "It is 5:25 a.m., it is March 21st, 2019." (Tr. 148:2.) Ms. Rodriguez also knows the time, she added in her testimony, because the form's yellow copy, which was provided to her, notes the start time for the search as "5:25 a.m." (Def. Ex. P-1.) The yellow copy shows no end time for the search.

After she gave consent, Ms. Rodriguez was asked where the "magazine" was. (Tr. 151:3-4.) Ms. Rodriguez testified that she initially misunderstood this request, believing it referred to reading material, but that once the officer clarified that he meant the container for ammunition, she told him it was under the bed. The officers conducted the search and in fact found a black

Adidas brand duffel bag containing ammunition under a twin-size bed in Ms. Rodriguez's bedroom.[6] Ms. Rodriguez testified that during this time that the Rodriguez home was searched, she and her children were sitting on the couch in the living room and were not allowed to move. At some point, the children were permitted to get dressed and leave for school with their grandfather, but Ms. Rodriguez was required to remain in the home. She estimates that she remained in the apartment until about 8:40 a.m., at which time she was taken by the officers to the police station for questioning.

The Government does not dispute that, after finding the Firearm in the initial search of the Rodriguez home, the officers asked Ms. Rodriguez to sign a consent-to-search form and that the subsequent search revealed a black, zippered Adidas duffel bag containing ammunition, specifically five magazines containing 39 rounds (the "Ammunition"). However, Government witnesses Officer Pompeo and Sergeant Durning set forth a different sequence of events and other significantly different details. In particular, according to the Government, the exchange in which Ms. Rodriguez was asked to and did sign the consent form did not occur until approximately 8:25 a.m., after Officer Pompeo returned to 25 Johnson Avenue from arresting Johnson at 60 North 12th Street.

Officer Pompeo testified that his travel back to 25 Johnson Avenue from North 12th Street took approximately 15 to 20 minutes. He stated that he entered the Rodriguez home, waited for Officer Durning to arrive, and then proceeded to execute the consent form with Ms. Rodriguez. Officer Pompeo filled out the relevant information on the form, read the form out

---

[6] Ms. Rodriguez had earlier explained that, although there were two other bedrooms in her home, she had placed additional beds in her room because her children often moved into her room in the middle of the night.

loud to Ms. Rodriguez, and asked her to sign. He testified that, on the form, he noted the start time of the search as "8:25 a.m." This time is reflected in the top copy of the consent form, admitted as Government Exhibit 5; however, the evidence presented by the Government is not the original of the consent form but rather a copy of its top layer. Officer Pompeo was questioned about the discrepancy between the time notation on the top copy and on the yellow copy of the consent form. He stated that it appears to be due to poor transfer of information between the notation he made and the yellow copy. Moreover, according to Officer Pompeo's testimony, he and the fugitive task force team were not at the Rodriguez home at 5:25 a.m. on March 21, 2019. He testified that at about 5:30 that morning, the team was meeting to brief about its upcoming activities.

Likewise, Sergeant Durning testified that at 5:25 a.m. he was not at the Rodriguez home, but rather in his own home still in bed. Sergeant Durning stated that he was at the State Police barracks when he received a call just before 8 a.m. requesting his assistance in an investigation involving the Firearm discovered in the Rodriguez home. When he arrived at 25 Johnson Avenue, Sergeant Durning saw that the children had already left for school. He testified that he saw them getting into a car outside the building as he arrived. Sergeant Durning further testified that when he entered the Rodriguez home, he observed Ms. Rodriguez sitting on the living room couch, where Officer Pompeo was filling out the consent-to-search form. Sergeant Durning testified that Ms. Rodriguez did not have any questions about the form and did not ask that it be translated into Spanish. He witnessed Ms. Rodriguez sign the form. Sergeant Durning described her demeanor as calm and cooperative throughout this process.

14

The consent-to-search form submitted as evidence by the Government notes that the search of the Rodriguez home concluded at 8:50 a.m.

### D.     Interview of Johnson and Rodriguez at the State Police Barracks

Following the second search, Ms. Rodriguez was transported to the New Jersey State Police barracks for questioning. Defendant was also transported to the State Police barracks. It is uncontroverted that, although both Ms. Rodriguez and Johnson were at the barracks on the morning of March 21, 2019, they did not see one another or receive information concerning each other's status.

Independent and separate interviews of Johnson and Ms. Rodriguez took place at the barracks. Ms. Rodriguez was brought into a conference room and advised of her Miranda rights. She was presented with a form setting forth each Miranda right in written in both English and Spanish, and each individual right was read to her in English. Ms. Rodriguez confirmed her understanding of each right as it was recited to her. At 9:29 a.m., she signed the form acknowledging and waiving her Miranda rights. Ms. Rodriguez proceeded to give an audio-recorded statement lasting approximately five minutes. After concluding her statement, Ms. Rodriguez called her father to pick her up from the barracks.

Once Ms. Rodriguez had left, Defendant was brought into the conference room for questioning. He, too, was advised of his Miranda rights. Johnson acknowledged his understanding of the Miranda rights and signed a form waiving his rights at 9:49 a.m. Johnson proceeded to give an audio-recorded statement lasting less than ten minutes. At the evidentiary hearing, Defendant testified that, in light of the pressure placed on him by the officer who had

approached him outside of 25 Johnson Avenue, he did not feel he could refuse to talk to the police. Johnson testified as follows:

> Q. And what did you do in the conference room?
>
> A. Basically I admitted the gun was mine.
>
> Q. And how were you feeling during that—while you were in the conference room?
>
> A. Well, I felt—I already knew—I already knew what I had to do, like I already knew that I had accepted responsibility for the gun, so it was already established already.
>
> Q. Did you feel like you could refuse to give that statement?
>
> A. No.
>
> Q. What, if any, form was presented to you during the interview?
>
> A. Miranda.
>
> Q. What did you do with that form?
>
> A. I signed it.
>
> Q. Did signing that form change how you felt?
>
> A. No.
>
> Q. How much time had you been in custody from the time of your arrest until the time you gave your statement?
>
> A. Maybe around maybe four hours, three and a half hours.

(Tr. 247:22-248:17.)

In the statement he gave to police, Johnson claimed the Firearm belonged to an unnamed friend. Johnson said this friend gave him the Firearm and Ammunition for safekeeping and that the friend died shortly thereafter. Johnson also told police that he had placed the Firearm in Ms. Rodriguez's closet over one year prior to March 21, 2019.

## II.   MOTION TO SUPPRESS

### A.   The Firearm

Defendant argues that evidence of the Firearm must be suppressed to remedy the constitutional violation committed in a warrantless search of the Rodriguez home on March 21, 2019. The Fourth Amendment prohibits unreasonable searches and seizures, and it is well-established that, in general, entry into a person's house without a warrant is "unreasonable per se." Payton v. New York, 445 U.S. 573, 586 (1980). Under the exclusionary rule created by the Supreme Court, any evidence seized in violation of a criminal defendant's Fourth Amendment rights must be excluded from trial. Alderman v. United States, 394 U.S. 165, 171 (1969); see also United States v. Franz, 772 F.3d 134, 145 (3d Cir. 2014) ("The exclusionary rule is a prudential doctrine designed to enforce the Fourth Amendment . . . by preventing the government from relying at trial on evidence obtained in violation of the Amendment's strictures."). "A defendant must have standing to invoke the Fourth Amendment's exclusionary rule." United States v. Correa, 653 F.3d 187, 190 (3d Cir. 2011). A defendant has standing if he has a legitimate expectation of privacy in the invaded place. Id. Johnson's standing to challenge the searches of the Rodriguez home is not in dispute. Indeed, given his possession of the key to

the apartment and the time he spent there, there appears to be no questions that he had a legitimate expectation of privacy in the Rodriguez home.

The Government concedes that the evidence of the Firearm was obtained in a warrantless search of the Rodriguez home. While there are some exceptions to the search warrant requirement, Defendant maintains that the Government has not demonstrated that those exceptions apply to this case. Defendant contends that the first, early morning search, ostensibly conducted for the purpose of locating and arresting Johnson, was unreasonable under the Fourth Amendment because (1) Ms. Rodriguez did not give the officers consent to enter and look for Johnson in her home; (2) no exigency existed to justify the officers' actions; and (3) the officers had no probable cause to believe that Johnson was inside the Rodriguez home. Defendant further contends that even if the first search itself was justified, the Government has not demonstrated that the Firearm was discovered in plain view inside the bedroom closet.

The Government does not claim the officers entered the home under exigent circumstances or that the search was justified in their attempt to execute the arrest warrant by probable cause that Johnson was inside the Rodriguez home. Rather, the Government argues that the initial search of the Rodriguez home was justified by the verbal consent freely given by Ms. Rodriguez. The Government further maintains that the testimony presented at the hearing establishes that the plain view doctrine applies. Thus, it argues that the search of the Rodriguez home in which the Firearm was discovered was not unreasonable under the Fourth Amendment, and the Firearm should not be excluded as evidence in the trial against Johnson.

"[A] search conducted pursuant to consent is one of the specifically established exceptions to the search warrant requirement." United States v. Givan, 320 F.3d 452, 459 (3d

18

Cir. 2003) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973)). To meet the Fourth Amendment's reasonableness requirement, consent to search must be given voluntarily. <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548 (1968); <u>see also</u> <u>Givan</u>, 320 F.3d at 459 (holding same). Whether an individual has given voluntary consent "'is a question of fact to be determined from the totality of all of the circumstances.'" <u>Givan</u>, 320 F.3d at 459 (quoting <u>Schneckloth</u>, 412 U.S. at 227); <u>see also</u> <u>United States v. Crandell</u>, 554 F.3d 79, 88 (3d Cir. 2009) ("Consent to a search is determined by examining all the circumstances . . .."). The Third Circuit has identified several "critical factors" to be considered in a totality of the circumstances inquiry: "the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual." <u>Givan</u>, 320 F.3d at 459. It has also held that officers are not, however, required to advise citizens that they may refuse to consent, and the absence of this warning when seeking permission to search does not affect the consent inquiry. <u>Crandell</u>, 554 F.3d at 88 (citing <u>United States v. Drayton</u>, 536 U.S. 194, 206-07 (2002)).

The validity of the early morning search depends on the question of whether Ms. Rodriguez in fact gave voluntary verbal consent. In its endeavor to gather the facts necessary to make this determination, the Court heard witness testimony at an evidentiary hearing conducted over the course of two days. As the factual summary above makes clear, on the issue of consent, the testimony proffered by the Government directly contradicts the testimony presented in support of Defendant's motion. Thus, the question the Court must resolve turns on the on the credibility of the testimony.

In particular, the Court must evaluate the competing testimony of Officer Pompeo and Ms. Rodriguez. In his version of events, Officer Pompeo asked Ms. Rodriguez if the officers

could look around to confirm that Johnson was not in the Rodriguez home, and Ms. Rodriguez said "no problem" and stepped aside. In contrast, Ms. Rodriguez asserted that, without permission, several officers entered her home as soon as she opened the door and then one of the officers, on his own, went to the back end of the apartment, down the corridor where the bedrooms are, and found the Firearm in a closet.

The Court credits Officer Pompeo's testimony because he offered a version of events that is not only plausible but also aligns with the respective motivations of law enforcement and Ms. Rodriguez, in light of other, undisputed facts surrounding the events of March 21, 2019. Officer Pompeo described an approach to searching for Johnson that was consistent with police procedure. His team first confirmed that the Rodriguez home was connected to Johnson, by knocking on the door of a neighboring apartment, in which Johnson's sister lived. Then, after making contact with Ms. Rodriguez, asking her if Johnson was in her apartment, and learning from Ms. Rodriguez that only she and her children were home, the police proceeded to ask if they could look around to confirm this information for themselves, especially in light of the noise they heard from inside the apartment. Officer Pompeo, notably, does not minimize the show of force created by the sheer police presence in the encounter with Ms. Rodriguez. He described a group of at least seven armed officers, dressed in tactical gear, approaching Ms. Rodriguez early in the morning after apparently waking her from sleep. It was under these conditions, as described by Officer Pompeo, that the officers asked for permission to search; these facts, if anything, might have been interpreted by a court as weighing against voluntariness. Nevertheless, Officer Pompeo did not downplay these details, which the Court finds bolsters his credibility. Moreover, in his account of the ensuing search, Officer Pompeo stated that two

20

officers entered the bedroom area of the Rodriguez home, removed the children from that area and then proceeded to conduct a more thorough search for places Johnson could be hiding, including the bedroom closet. This description is consistent with safeguarding the officers themselves, as well as the children they were told were asleep in the bedroom area. In contrast, Ms. Rodriguez's account of the search has a sole officer entering a narrow corridor in an unfamiliar location where he suspects that a possibly armed fugitive, with a criminal history, may be hiding and attempting to evade capture. Her version, in which an officer disregards his training and puts himself and minor children at risk of serious injury or death, is simply implausible. Additionally, Officer Pompeo's testimony that the officers sought and obtained Ms. Rodriguez's permission to see for themselves that Johnson was not home is consistent with the encounter's surrounding circumstances. The Court notes that Officer Pompeo had not met Ms. Rodriguez or Johnson prior to March 21, 2019. There is no indication that his fugitive task force team was interested in anything other than finding Johnson to execute on the arrest warrant related to the Middlesex Boro burglary and car theft charges. As to Ms. Rodriguez, the Court notes that she herself testified that Johnson was in fact not in her apartment on March 21, 2019 but rather, she believed, at his mother's house. Given that Ms. Rodriguez knew Johnson was not in her home, her acceding to the officers' request to look for Johnson would be, from her perspective, designed to limit her interaction with the police. In other words, permission to search for a person she knows not to be present would align with Ms. Rodriguez's reasonable motivation to have the police search the home and leave as soon as possible, and thus deal with the situation in the least confrontational way.

Because the Court finds Officer Pompeo's testimony credible, it proceeds to evaluate whether Ms. Rodriguez's consent was given voluntarily. Based on the officer's testimony, the Court finds that Ms. Rodriguez's words, actions, and demeanor indicate voluntariness. According to Officer Pompeo, when the officers asked if they could look for Johnson, Ms. Rodriguez calmly responded "no problem" and stepped aside to let the officers through. Ms. Rodriguez is not elderly or infirm, and there is no indication that Ms. Rodriguez was confused or overwhelmed when asked for permission. Although the questioning of Ms. Rodriguez did not delve into her educational background, the Court takes note that she presented as an intelligent, articulate witness. Thus, in light of the totality of the circumstances, the Court finds that Ms. Rodriguez voluntarily consented to the search of her home to look for Johnson.

It follows from this finding that the search inside the closet was lawful. In a search authorized by consent, "the scope of the search is limited by the terms of its authorization." Walter v. United States, 447 U.S. 649, 656 (1980). The scope of the consented-to search must be measured according to the standard of "objective reasonableness" and "defined by its expressed object." Florida v. Jimeno, 500 U.S. 248, 251 (1991). Here, it is clear that the object of the search was Johnson himself. Therefore, a reasonable person would have understood the exchange between Ms. Rodriguez and the officers as authorizing them to search her home in any places where Johnson might be located. The bedroom closet, where the Firearm was discovered, is such a spot. Photographic evidence of the closet, as well as a testimonial description of its size, was presented at the evidentiary hearing. While the closet was of modest dimensions, estimated to be about three to three-and-a-half feet wide, it certainly appeared to be a place large enough for Johnson to be hiding.

The next step in the Court's analysis regarding the legality of the search yielding the Firearm is to examine the applicability of the plain view doctrine. The Supreme Court has held that, under the plain view doctrine, the police may seize an object without a warrant "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (citing Horton v. California, 496 U.S. 128, 136-37 (1990) and Texas v. Brown, 460 U.S. 730, 739 (1983)). The Court finds that the Government's testimony supports all three of these conditions. The police had lawfully opened the closet to look for Johnson and, in that search, saw the Firearm in the closet. The incriminating nature of the Firearm, an assault weapon, was immediately apparent. The officers had a lawful right of access to the Firearm because, as Officer Pompeo described, it was out in the open within the closet.

The Court is aware that Ms. Rodriguez's testimony contradicts the latter detail, which is significant to the critical question of whether the Firearm was in plain view of the officers from a lawful vantage point. The scope of the search was, as stated, limited to places where Johnson might be found, and thus the officers were permitted to enter the closet but not to check smaller containers within the closet, for example, a shoe box or shopping bag. At the hearing, Ms. Rodriguez admitted that the Firearm had indeed been stored in her closet but testified that it was wrapped in a blanket, which, if true, would obscure the Firearm from view without searching beyond the bounds of the consent given by Ms. Rodriguez. Defendant argues, moreover, that the Government's failure to call as a witness the individual officer who discovered the Firearm in the

closet casts doubt on the Government's description of this detail and prevents it from meeting its burden to establish that the plain view doctrine applies.

The Court has considered these arguments, and nevertheless finds that the Government has indeed met the burden required to avail itself of the plain view doctrine. Again, the plain view analysis depends on witness credibility as to the condition of the Firearm when the officers looked inside the closet, that is, whether it was exposed to view or wrapped in a blanket. On this point, the Court finds Officer Pompeo's testimony more reliable than Ms. Rodriguez's testimony. Officer Pompeo related the information he received from his team at the time the Firearm was discovered. The team, whose object it was to find and arrest Johnson, would have no reason to fabricate this detail or to delay their pursuit of Johnson conducting excessively broad searches for contraband. The only indication that the Firearm had been stored in the closet wrapped inside a blanket was Ms. Rodriguez's recollection, but her recollection regarding storage of the Firearm was flawed. On the morning of the search, Ms. Rodriguez stated in her interview with police that the Firearm had been placed in her closet about a month before March 21, 2019, but Defendant stated that he placed it there about a year before that date, purportedly storing it for a since-deceased friend.

Therefore, the Court finds that the Firearm was obtained in a lawful search under the Fourth Amendment. As set forth above, the testimonial and material evidence presented at the hearing demonstrates that the Firearm was discovered in plain view during a lawful search of the Rodriguez home authorized by Ms. Rodriguez's verbal consent.

**B.      The Ammunition**

Next, the Court must consider the constitutionality of the second search, in which the Ammunition was found in a duffel bag in the Rodriguez home. Prior to the second search, Ms. Rodriguez signed a consent form, giving the officers permission to search her home. Defendant argues that Ms. Rodriguez's written consent to search was invalid because it was involuntary and tainted by the illegality of the first search. Given the Court's holding that the first search was lawful, the Court need not address Defendant's argument that the written consent does not purge the primary taint of the earlier search. Thus, as to the legality of the second search, the sole issue to be resolved is whether Ms. Rodriguez was coerced to sign the consent form.

To find that Ms. Rodriguez signed the form under duress or against her will, the Court would have to credit her testimony that the officers who presented her with the consent form threatened that that they could involve child welfare services if she did not cooperate. However, it cannot. Her account of the events following the discovery of the Firearm and leading up to the execution of the consent form diminish the reliability of her version of the facts surrounding her decision to give written consent to search. According to Ms. Rodriguez, the officers arrived at her home at about 5 a.m., looked through the apartment, found the Firearm, and confronted her with their discovery in her bedroom where the Firearm was lying on top of the bed. She said that the officers told her that the Firearm would be considered to belong to her, expressly threatening that she would go to jail for murder and would lose custody of her children. Immediately thereafter, Ms. Rodriguez further recounted, she was brought into the living room and presented with the consent form, which she claims she signed because she was afraid of the consequences.

25

The time, according to Ms. Rodriguez, was 5:25 a.m., which she claims to know because she remembers the officer saying the date and time out loud when she signed.

The Court contrasts these details with the testimony of Officer Pompeo: After the initial search of the Rodriguez home, Pompeo went to 60 North 12th Street in search of Johnson. It was only after he arrested Johnson and returned to the Rodriguez home at 25 Johnson Avenue that Officer Pompeo, joined by Sergeant Durning, reviewed the consent form with Ms. Rodriguez, witnessed her sign it, and oversaw the subsequent second search of the Rodriguez home. Officer Pompeo's travel time from 25 Johnson Avenue to North 12th Street, and then back again, would have taken from about 30 to 40 minutes, given the distance between the two locations. Add to that whatever amount of time was spent at 60 North 12th Street, as recounted by the testimony of Defendant and Defendant's mother. Even if the first search occurred shortly after a 5 a.m. arrival of law enforcement at the Rodriguez home, as Ms. Rodriguez testified, Ms. Rodriguez's insistence that she signed the consent form 25 minutes later is simply impossible.

This sequence of events and timeline set forth by Officer Pompeo is corroborated by Sergeant Durning's testimony. Sergeant Durning stated that when he received a call to respond to 25 Johnson Avenue to assist in a firearms investigation, he was at the barracks, having reported for duty shortly before the call came in. He estimated that this occurred at about 8 a.m. Sergeant Durning was not on duty at 5:25 a.m. He testified that he was home sleeping at that time. Sergeant Durning further testified that when he arrived at the Rodriguez home, Ms. Rodriguez's minor children were no longer in the apartment. Ms. Rodriguez herself admitted that

at some point after the initial search, she was permitted to call someone to come help get the children ready for school and that her father in fact came over and took the children from her home.

In Ms. Rodriguez's version, the discovery of the Firearm and execution of the consent form happened in quick succession, in an almost seamless stream during which she was repeatedly threatened with jail time and losing custody of her children. However, the two officers who were with Ms. Rodriguez as the consent form was being prepared, reviewed, and executed were Officer Pompeo and Sergeant Durning. It is clear that neither of them was in Ms. Rodriguez's home at 5:25 a.m.

The Court has taken note of the timing of events on the morning of March 21, 2019 not because these details are necessarily relevant, in and of themselves, to the voluntariness of Ms. Rodriguez's consent to the second search. Rather, the implausibility of Ms. Rodriguez's version calls into question her recollection of the circumstances in which the consent form was reviewed and signed. The Court does not, therefore, credit her testimony that she signed the consent form in a coercive environment.

For the reasons set forth above, the Court therefore finds that no facts indicate that Ms. Rodriguez signed the consent form under coercion or duress. The Government has demonstrated that her written consent to search the Rodriguez home lawfully authorized the second search, during which the Ammunition was discovered. Accordingly, the Court concludes that the search complied with the Fourth Amendment, and as such, Defendant's motion to suppress this evidence must be denied.

27

**C.     The Statements Given by Rodriguez and Johnson**

The final piece of Defendant's motion to suppress asks the Court to exclude evidence of the statements he and Ms. Rodriguez independently gave to the police at the New Jersey State Police barracks on March 21, 2019. As the testimony presented at the evidentiary hearing established, Defendant and Ms. Rodriguez were each advised of their Miranda rights, waived those rights in writing, and knew that their subsequent statements were being audio recorded. Defendant argues that the statements must be suppressed as "fruit of the poisonous tree," on the grounds that the statements are tainted by the Fourth Amendment violations committed by the police in searching the Rodriguez home. He further argues that the March 21, 2019 statements were coerced, in spite of the Miranda waivers, because of threats made by the police.

Insofar as Defendant argues that the statements are not sufficiently attenuated from the purportedly illegal searches of the Rodriguez home and thus constitute fruit of the poisonous tree, this basis for suppression has been obviated by the Court's finding that the searches of Rodriguez's home were reasonable under the Fourth Amendment. The fruit of the poisonous tree doctrine, an extension of the exclusionary rule, "excludes evidence obtained from or as a consequence of lawless official acts." Costello v. United States, 365 U.S. 265, 280 (1961). In this case, the predicate "lawless official act" does not exist.

The Court, then, turns to Defendant's argument that the statements given at the police station must be suppressed because Ms. Rodriguez's and Defendant's respective Miranda waivers were invalid. It is well established that, under Miranda v. Arizona, the police must inform a suspect of various rights prior to questioning, so as to dispel any compelling pressures

inherent in custodial interrogations. <u>United States v. Velasquez</u>, 885 F.2d 1076, 1084 (3d Cir. 1989) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 468-70 (1966)). It is equally well-established that these rights may be waived "provided the waiver is made voluntarily, knowingly and intelligently." <u>Id.</u> (quoting <u>Miranda</u>, 384 U.S. at 444.) Determining whether a waiver is valid has two components:

> First, the waiver must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

<u>Id.</u> (internal citations and quotations omitted). Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of the defendant. <u>North Carolina v. Butler</u>, 441 U.S. 369, 374-75 (1979).

As to Johnson, Defendant's post-hearing brief argues that the "intimidation tactic" used by the officers when they brought Defendant to 25 Johnson Avenue following his arrest "led directly to the inculpatory statement given by Mr. Johnson at the station." (Def. Br. at 32.) Defendant testified that as he sat outside 25 Johnson Avenue, he was approached by an officer, who threatened that, unless Defendant confessed that the Firearm belonged to him, Ms. Rodriguez would take the blame for having the Firearm in her home and that her children would be taken by the state's child protective services. Johnson further testified that as result of this exchange with the police officer, Johnson felt he had no choice but to give a statement later that morning taking responsibility for the Firearm. Essentially, Defendant argues that the unbroken chain of events while he was in custody on the morning of March 21, 2019—from the threats made by the officer outside of 25 Johnson Avenue to the Miranda waiver form Defendant signed

29

at the police station at 9:49 a.m. to the interview conducted thereafter—rendered Defendant's Miranda waiver involuntary.

The problem with this argument is that it requires, at a minimum, that the Court credit Defendant's testimony that an officer had made comments to him concerning the repercussions to Ms. Rodriguez if Defendant failed to admit the Firearm was his. It further requires that the Court find that Defendant was in fact intimidated by such comments and thus felt compelled to talk to the police. The record, however, casts doubt on Defendant's assertions for a number of reasons. In the first place, the Court notes the lack of corroborating evidence for Defendant's testimony concerning the conversation outside 25 Johnson Avenue. Second, as the Government has noted in its brief, Defendant is no stranger to the criminal justice system. At that time of his interrogation on March 21, 2019, Johnson, then 28 years old, had been arrested fourteen times and had seven felony convictions, for drug and weapons offenses as well as bribery. This history casts further doubt on Johnson's assertions that he felt overcome by pressure by the police to take responsibility for the items found in the Rodriguez home. Third, during its cross-examination of Defendant, the Government elicited a number of admissions regarding Defendant's past interactions with police, which indicate that Defendant was well-aware of his right not to give a statement. In particular, Defendant admitted that on February 18, 2017, while he and another female were in a motor vehicle owned by Ms. Rodriguez, Defendant was shot at repeatedly by some unidentified person or persons and continued to be shot at when Defendant fled the vehicle on foot. When Defendant fell, those pursuing him stood over Defendant and shot at him again. In spite of this apparently deliberate attempt to murder Defendant, Defendant refused to cooperate with the police in the investigation. Fourth, Defendant's testimony that he

felt forced to accept responsibility for the Firearm is further belied by the fact that, in his statement to police, Defendant told police that the Firearm was not actually his but rather that it belonged to a friend and that Defendant had stored it in the Rodriguez home for his friend.

In light of the foregoing, the Court finds no credible evidence that the Miranda waiver given by Johnson was the product of coercion or intimidation. There is no indication that his statement was in any way involuntary. Defendant's request that his statement be suppressed will be denied.

As to Ms. Rodriguez, Defendant argues that her statement to police was given involuntarily and therefore cannot be used against him at trial. It is doubtful that Johnson would even have standing to seek suppression on this basis, that is, to assert that Ms. Rodriguez's Fifth Amendment rights were violated. Normally, one only has standing to assert claims based upon the violation of his or her own constitutional rights. Alderman, 394 U.S. at 171-72, 174 (holding, in the context of applying the exclusionary rule to remedy a Fourth Amendment violation, that "[t]he established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence . . . We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."); see also United States v. Fredericks, 586 F.2d 470, 481 (5th Cir. 1978) (applying the standing principle articulated in Alderman to hold that a defendant lacked standing to seek suppression of evidence obtained in violation of another individual's Fifth Amendment rights); United States v. Bruton, 416 U.S. 310, 312 (8th Cir 1969) ("It has long been held that the Fifth Amendment right to be free from

self-incrimination is a personal right of the witness."). Nevertheless, because the parties have presented arguments concerning Defendant's request that Ms. Rodriguez's statement be suppressed as coerced, the Court will discuss the issue as if he had standing to seek its suppression.

Defendant points to no evidence whatsoever to support his argument that Ms. Rodriguez gave the statement under duress or was not fully aware of the consequences of waiving her Miranda rights. Defendant's opening brief had suggested that the waiver was not valid because the rights were reviewed with Ms. Rodriguez in English, the interview was held in English, and Ms. Rodriguez was not given the benefit of a Spanish interpreter. It appears that Defendant is no longer pursuing that argument. However, even if he were, the Court finds no evidence to support the contention that Rodriguez did not fully comprehend the Miranda rights she was read prior to her statement or the consequences of waiving those rights. As noted earlier, Ms. Rodriguez testified coherently in English during the evidentiary hearing and responded to all but a few of the questions on cross-examination without the need for translation from the available interpreter. Moreover, as the Government states, the Miranda waiver form provided to Rodriguez set forth each Miranda right in both English and Spanish. Though this was pointed out to Rodriguez, she did not indicate a need to consult the Spanish translation as each individual right was recited to her and she affirmatively responded that she understood. Accordingly, insofar as the motion to suppress seeks to preclude Ms. Rodriguez's March 21, 2019 statement to police, the motion will be denied.

### III.   OTHER MATTERS RAISED IN DEFENDANT'S OMNIBUS MOTION

In addition to the motion to suppress, Defendant's omnibus submission to the Court requests various pre-trial discovery and hearings for the purpose of allowing Defendant to prepare his case for trial. The Court has reviewed these requests and makes the following determinations:

### A.   Brady Material

The Government has recognized its obligation under <u>Brady</u> to disclose exculpatory evidence in its possession. It has indicated that it has fully complied with its obligations thus far and will continue to supply the required material should any come into its possession. The Court considers this response by the Government to adequately address Defendant's request.

### B.   Giglio Material

The Government has likewise recognized its obligation under <u>Giglio</u>. The Court directs the Government to supply any <u>Giglio</u> material to Defendant no later than three days prior to the start of trial.

### C.   Rule 404(b) Evidence

Defendant anticipates that the Government will seek to introduce evidence of other crimes in its case in chief pursuant to Federal Rule of Evidence 404(b) and requests that the Government specifically identify that evidence and its basis for admission. Concerning this request, the Court directs the Government to notify Defendant of any Rule 404(b) evidence that it proposes to offer at trial no later than fourteen days before the start of trial.

### D.      Expert Witnesses

The Government has advised Defendant that it intends to present expert testimony concerning the Firearm and Ammunition at issue in this case. Defendant requests that it be provided immediately with all expert reports or test results as well as a summary of the expert testimony the Government intends to introduce. The Court directs the Government to provide Defendant any and all reports of the Government's proposed expert witnesses no later than thirty day prior to trial.

### E.      Jencks Act Material

The Court recognizes that under the Jencks Act, the Government is not obligated to provide a witness's prior statements until the completion of the witness's direct examination. 18 U.S.C. § 3500. Nevertheless, in order to expedite the trial, the Court encourages the Government to provide Defendant with Jencks material as early as possible so that trial proceedings are not prolonged or delayed.

### F.      Rule 609 Hearing

Finally, Defendant requests that the Court conduct a hearing to determine the admissibility of Defendant's prior convictions for impeachment purposes under Federal Rule of Evidence 609(a). The Government does not oppose this request. The Court advises the parties that it will conduct a hearing no later than five days prior to trial.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence will be denied in its entirety. The Court will file an appropriate Order.


                                                               __s/ Stanley R. Chesler__

                                                STANLEY R. CHESLER

                                          United States District Judge


Dated: May 22, 2020